**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GNCO, INC., | ) | CIVIL DIVISION |
| TOWLIFT, INC., | ) | |
| EAGLE MARK 4 EQUIPMENT CO., and | ) | Case No.   2:21-cv-318 |
| FLEET TEAM, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN HARMON and | ) | |
| BURNS INDUSTRIAL EQUIPMENT, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiffs GNCO, Inc. ("GNCO"), Towlift, Inc. ("Towlift"), Eagle Mark 4 Equipment Co. ("Eagle Mark") and Fleet Team, Inc. ("Fleet Team") (collectively "Plaintiffs") bring this action against Defendants Ryan Harmon ("Harmon") and Burns Industrial Equipment ("Burns Industrial") (collectively "Defendants") and state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are a group of commonly owned businesses in the materials handling, forklift and industrial equipment, consulting and truck sales/rental industries, with locations throughout the region, including Pennsylvania and Ohio. GNCO is the parent company and owner of the other three Plaintiffs:  Towlift, Eagle Mark, and Fleet Team.  Together, Plaintiffs supply customers with commercial and industrial equipment and trucks, and provide consulting in fleet management.  Plaintiffs assert claims against Defendants, a former executive and his current employer, for conversion of their confidential information, customer lists, customer pricing, customer contacts, customer history, customer payment and methods, planned maintenance for customers, financial information and projections, margins, costs, product

information such as descriptions, specifications, numbers, suppliers, marketing and business development information, material characteristics, prices, catalogs, sales literature, customer and supplier information including vendor or supplier pricing, detailed business development opportunities, and detailed information concerning pending deals ("Confidential Information"). As set forth below, while still employed by Plaintiff Towlift and a member of GNCO's Executive Committee, Harmon secretly converted Plaintiffs' Confidential Information and intentionally afforded Plaintiffs no advance notice of his intention to resign on February 3, 2021, all with the knowledge and ratification of Burns Industrial.   Until his abrupt resignation to become the Vice President of Business Development and Fleet at Burns Industrial, Harmon was a member of GNCO's Executive Committee and had been entrusted to open and develop Towlift's Pittsburgh branch and serve as its General Manager.   As the General Manager of Towlift's Pittsburgh office and a member of the Executive Committee, which were positions of substantial responsibility as well as compensation, Harmon had unbridled access to a suite of Plaintiffs' Confidential Information, which is extremely sensitive and competitive information regarding all of the GNCO businesses and that of its suppliers. Plaintiffs' Confidential Information was highly safeguarded and could be broadly accessed by only the most senior executives.   Plaintiffs' Confidential Information, individually and together, constitutes trade secrets under applicable federal, Pennsylvania, and Ohio trade secrets law.   Harmon secretly abused the trust and access he had been given to this highly sensitive competitive information for his own benefit and the benefit of his prospective and now current employer, Burns Industrial, one of the largest competitors of Plaintiffs, in anticipation of his resignation and employment by Burns Industrial.   As of this date, Harmon and Burns Industrial have already begun using Plaintiffs' Confidential Information to unfairly compete with Towlift and Fleet Team in the

marketplace, at a potentially very grave cost to Plaintiffs, including lost profits and loss of good will.  Plaintiffs, at great expense, have discovered, and are continuing to uncover, Defendants' misconduct through an analysis of data retained on computer hard drives and digital devices utilized by Harmon, as well as paper documentation unintentionally left behind by Harmon.

Plaintiffs request an accounting of all revenue or other benefits derived from the unlawful taking of the  trade secrets in any form removed by Harmon and provided to Burns Industrial; the return of Plaintiffs' trade secrets which were misappropriated by Harmon; an injunction enjoining Harmon from working at Burns Industrial or any similar competitor; an injunction prohibiting Harmon and Burns Industrial from using or disclosing the misappropriated trade secrets or from engaging in similar misconduct or unfair competition; attorneys' fees and costs; double damages under the federal Defend Trade Secrets Act and Pennsylvania Trade Secrets Act; treble damages under the Ohio Uniform Trade Secrets Act; exemplary damages for the outrageous abuse of trust and theft and misuse of information and opportunities by Defendants; and for such other relief as is just, following discovery in this matter and an accounting of the misconduct.

### THE PARTIES

#### Plaintiffs

2.      GNCO is an Ohio corporation whose principal place of business is located at 1395 Valley Belt Road, Cleveland, OH 44131.  Its wholly owned subsidiaries include Towlift and Eagle Mark, who buy, sell, lease, and service material handling equipment, and Fleet Team, who provides consulting to its customers concerning material handling equipment.

3.      Towlift is an Ohio corporation with its principal place of business located at 1395 Valley Belt Road, Cleveland, OH 44131.

4.      Towlift also maintains a place of business at 304 Deer Run Road, Suite #3, Sewickley, PA 15143 (the "Pittsburgh Branch").

5.      Eagle Mark is an Ohio corporation with its principal place of business located at 330 Ashland Rd, Mansfield, OH 44905.

6.      Fleet Team is an Ohio corporation with its principal place of business located at 6155 Rockside Rd Suite 200, Independence, OH 44131.

**Defendants**

7.      Harmon is a resident of Pennsylvania who, upon information and belief, resides at 212 Buckeye Drive, Harmony, PA 16037.  Until February 3, 2021, at which time he resigned, Harmon was employed by Towlift, as General Manager of Towlift's Pittsburgh branch.  On February 8, 2021, Harmon began his employment with Burns Industrial.

8.      Burns Industrial is a Pennsylvania corporation with its principal place of business located at 210 Thorn Hill Road, Warrendale, PA 15086.  Burns Industrial is in the same line of business as Towlift and Eagle Mark, but, on information and belief, is also starting a consulting business similar to that of Fleet Team.

**JURISDICTION AND VENUE**

9.      Plaintiffs are bringing claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 and, therefore, this Court has subject matter jurisdiction pursuant to 28 U.S.C §1331.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     There is also complete diversity among the parties, and the amount in controversy exceeds $75,000.00, so even if there was no federal claim, this Court would have diversity jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in the Western District of Pennsylvania. Specifically, Plaintiffs' cause of action arose in Allegheny County, Allegheny County is also the county in which Harmon was employed, and it is the county in which material events occurred.

## STATEMENT OF FACTS

### Harmon's Employment and Access to Trade Secrets

13.     Harmon commenced employment with Towlift in 2005 as a Systems Project Manager. Harmon held a variety of positions at Towlift until he transferred to Fleet Team in August 2013 where he was employed as a Fleet Manager.

14.     In September 2016, Harmon was transferred back to Towlift as a General Manager. As the General Manager, Harmon was charged with opening and acting as the senior executive of Towlift's newly created Pittsburgh Branch.

15.     As General Manager of the Pittsburgh Branch, Harmon had overall responsibility for the Pittsburgh Branch and Harmon's duties included business development and coordination, profitability of the branch, selling and leasing material handling equipment in the counties surrounding Pittsburgh, as well as hiring and firing employees at the branch.

16.     As General Manager, Harmon had access to Towlift's customer lists, customer pricing, customer contacts, customer history, customer payment and methods, financial information and projections, margins, costs, product information such as descriptions, specifications, numbers, suppliers, marketing and business development information, information concerning pending deals, material characteristics, prices, catalogs, sales literature, and vendor and supplier information including vendor and supplier pricing.

17.     As stated above, in addition to being the General Manager of the Pittsburgh Branch, Harmon was one of the members of GNCO's Executive Committee, formed in 2018.

The Executive Committee is composed of the Board of Directors and key executives of GNCO's subsidiaries.  It meets monthly and sets the strategic direction and goals for GNCO and its subsidiaries including Towlift, Eagle Mark, and Fleet Team.

18.     In his role on the Executive Committee, Harmon had unbridled access to the confidential information described in Paragraph 16, as well as access to all of that same information for all of GNCO's other subsidiaries (collectively defined above as "Confidential Information").  It is important to understand that the suite of Confidential Information concerned not just the details of Plaintiffs' businesses, but certain competitively sensitive details regarding Plaintiffs' suppliers and customers, with which Plaintiffs had been entrusted in the course of their business relationships and transactions.

19.     The Confidential Information is not known to the public. The Plaintiffs restrict access to their Confidential Information to those who need to know, and those in the most trusted positions such as the Executive Committee.

20.     Plaintiffs have safeguards, such as credentials and passwords, network logs, and firewalls, to protect the confidentiality of the Confidential Information.  Plaintiffs protect their Confidential Information at significant cost.

21.     In addition, Plaintiffs derive actual or potential independent economic value from this Confidential Information, and this Confidential Information constitutes a trade secret as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1839, Pennsylvania's Trade Secrets Act, 12 Pa.C.S. § 5302, and Ohio's Uniform Trade Secrets Act, O.R.C. § 1333.61(D).

22.     The industries in which Plaintiffs are engaged are highly competitive.  Plaintiffs have invested considerable time and money in developing their business information, marketing

and advertising information, customers, relationships with suppliers, and Confidential Information.

## Towlift's Employment Policies

23.     Towlift has a Handbook which contains written policies concerning the use of its computer, servers and e-mails systems, confidentiality, and the use of the internet, that are distributed to all employees who are required to execute a written acknowledgment of their review and receipt of those policies and compliance with them.

24.     Harmon acknowledged these policies and agreed to abide by them when he signed an Acknowledgement of Receipt on August 11, 2016.

25.     These Towlift policies advised Harmon that all data on Towlift's computer systems are Towlift's property.

26.     These Towlift policies also advised Harmon that Towlift computers and email systems should not be used for improper or unlawful purposes.

27.     Towlift's policies also prohibit the use of any unauthorized hardware to access company data and prohibit the disclosure of company data to a competitor or vendor.

28.     As set forth above, Harmon violated all of these policies when he misappropriated and converted Towlift's and its sister subsidiaries' Confidential Information.

## Harmon's Resignation and Acceptance of Employment with Burns Industrial

29.     On January 21, 2021, Harmon received an offer letter from Burns Industrial, offering him a position as Vice President.  Harmon did not resign at that time, but for reasons which became clear later, waited until February 3 to do so.

30.     On February 3, 2021, without having provided any prior notice or indication, Harmon announced his resignation from his employment with Towlift as of that day because he

had accepted a role as Vice President with Burns Industrial to begin on Monday, February 8, 2021.

31.     Within days after his commencement of employment at Burns Industrial, Harmon changed his LinkedIn profile to identify himself as himself the Vice President:   Business Development and Fleet at Burns Industrial.

32.     Burns Industrial, like Towlift and Eagle Mark, is in the material handling business and is one of Plaintiffs' largest competitors. Burns Industrial buys, sells, leases, and remarkets forklifts and other light construction or material handling equipment.

33.     Prior to its employment of Harmon, Burns Industrial did not provide the same type of consulting services as Fleet Team.

34.     Harmon intended to leverage Plaintiffs' Confidential Information for his own benefit and the benefit of Burns Industrial, and to the detriment of Plaintiffs.

### Harmon's Misappropriation of Plaintiffs' Confidential Information

35.     As a result of his position of trust with GNCO and Towlift, at all times material hereto, Harmon had broad access to all of Plaintiffs' Confidential Information.  Unbeknownst to Plaintiffs, Harmon intended to resign his employment with Towlift and accept employment with Burns Industrial, a competitor of Plaintiffs.

36.     Beginning on January 25, 2021, a little more than a week prior to his resignation on February 3, 2021, Harmon, for no legitimate business reason, surreptitiously accessed and then misappropriated Plaintiffs' Confidential Information including information regarding GNCO's subsidiaries.  The files which Harmon accessed were not limited to the Confidential Information of Towlift's Pittsburgh Branch for which he had responsibility but included, *inter alia*, Fleet Team, Eagle Mark and Towlift of Toledo.

37.    Harmon's misappropriation occurred through multiple means, including but not limited to using unauthorized hardware/external storage device(s) to unlawfully download and copy the Confidential Information, making handwritten notes of Confidential Information that could not be downloaded, printed or copied, accessing, and likely downloading and copying several non-Towlift files, which had nothing to do with his duties and responsibilities at Towlift, and printing other documents.

38.    On or about January 26, 2021, Harmon accessed Plaintiffs' computer files titled "clev.pmdue" and downloaded that file onto an external storage device. This file contains Towlift's Cleveland Branch's complete list of customer names, the make, model, and serial number of their equipment, customer contact name and phone number, the schedule for periodic maintenance of that equipment, and the cost of such maintenance ("Cleveland PM Master List").

39.    The information contained in the Cleveland PM Master List has been developed throughout the course of Towlift Cleveland's 55-year history.

40.    In the ordinary course of business, if a sales executive had need of the information referenced in paragraphs 38 and 39 above, Plaintiffs' IT department would run a targeted report upon request.  In this case, since Harmon had no legitimate basis for this request, he did not request the IT department's assistance.

41.    Rather, as a member of the Executive Committee with broad access to the information, Harmon created a query and ran an expansive report on his own.

42.    After he generated and saved the report, Harmon deleted the report from Plaintiffs' computer network.  It was only through a recreation of the search query that Plaintiffs' IT department was able to generate the report that Harmon originally created.

43.     Notably, although Harmon worked at Towlift's Pittsburgh branch, he generated this report for Towlift's Cleveland branch customers.  Shortly after he resigned his employment with Towlift, Harmon told a former Towlift colleague that he planned to solicit Towlift's clients, and take Towlift's business accounts located in Cleveland, Ohio.

44.     Harmon copied files off his laptop related to current Towlift Pittsburgh customers including red-lined contracts and negotiated Rental Agreements, and OneDrive Sales Files regarding Fleet Management and OneDrive Sales Files regarding Sales Demos.

45.     Additionally, supplier information was copied onto an external device related to confidential "price pages" for the three major lines Towlift exclusively represents in its market: Caterpillar Lift Trucks (Mitsubishi Logisnext Co.)(254 Pages), Jungheinrich (527 Pages), and Mitsubishi Forklift Trucks (353 Pages). These documents have extensive pricing information, confidential dealer rules related to sales strategies, and options available on offered equipment. This information is available through an online portal for dealer representatives direct from the manufacturer, is regarded as extremely confidential, and is entrusted to Plaintiffs as a result of their business relationship.  In fact, with regard to the above information and like information from other suppliers, for some, Plaintiffs Towlift and Eagle Mark are bound by non-disclosure agreements.

46.     Harmon took that external storage device with the above information on it when he resigned from Towlift.

47.     Additionally, prior to his departure, Harmon improperly accessed information from Plaintiffs' Salesforce cloud-based platform, which, *inter alia*, identifies and ranks Plaintiffs' business opportunities by the sales amount and likelihood of closing the transaction.

48.     In Harmon's role on the Executive Committee, he had complete access to all the information contained on Salesforce regarding GNCO and its subsidiaries. With the exception of the few executives, including Harmon, employees only had limited access to Salesforce and it was limited to information relevant to their specific jobs and branches.  Harmon was one of only two of Plaintiffs' sales executives with broad access to Salesforce.

49.     In order to protect the confidentiality of Plaintiffs' biggest business opportunities, Plaintiffs' computer system is programmed to prevent the printing of the list of business opportunities.

50.     Consequently, because Harmon could not print the list, he copied and wrote down on a yellow legal pad the identities of Plaintiffs' fourteen largest business opportunities, what the opportunities were, and the locations of the opportunities with the intent of using this information for his own benefit and the benefit of Burns Industrial once he left the employ of Towlift.  Harmon reviewed these deals (and likely others) one at a time from the Salesforce Cloud Platform.  He saw the proposed pricing for each of these deals, what products were involved, and other sensitive details.  The accounts represented by these fourteen opportunities are valued at approximately $25,000,000.00.

51.     Plaintiffs only learned of the yellow legal pad, and Harmon's duplicity, because Harmon forgot the legal pad inside a portfolio in his company car, which he returned to Towlift's President, Matthew Adams, on February 3, 2021, the day he resigned.

52.     Harmon later contacted Robert Kwieciak, Towlift's Cleveland Sales Manager, asking that the portfolio (with the yellow legal pad ensconced inside), be returned to him.

53.     On or about January 25, 2021, Harmon accessed and downloaded on an external storage drive Confidential Information of Fleet Team including templates of agreements and

contracts of Fleet Team. This information is confidential and proprietary to Fleet Team.  The templates, developed over several years, are part of the reason for Fleet Team's success. All of this Fleet Team information is information for which Harmon would have had no legitimate use even had he continued to be an employee of Plaintiffs.  In addition, with regard to some of the customer information Harmon accessed, Plaintiff Fleet team is bound by non-disclosure agreements with various customers.

54.     During his January trade secrets misappropriation spree, after copying Plaintiffs' Confidential Information, Harmon digitally attempted to "cover his tracks" and also *deleted*, and attempted to delete, many of Towlift's files on sales to Fleet Team, so that Towlift no longer had access to these files, hampering Plaintiffs' ability to service customers and to compete in the marketplace.

55.     One of Harmon's responsibilities at Burns Industrial is to develop a fleet management operation for Burns Industrial, as evidenced by his title.

56.     In sum, Harmon improperly accessed and misappropriated, as well as deleted from Plaintiffs' servers, Plaintiffs' Confidential Information in order to gain an unfair and unlawful competitive advantage over Plaintiffs and to benefit himself and Burns Industrial.

**Burns Industrial Conspired with Harmon to
Unlawfully Obtain Plaintiffs' Confidential Information**

57.     Harmon's unlawful actions were with the knowledge, authorization and ratification of Burns Industrial which intended to use Plaintiffs' Confidential Information for its own benefit and to Plaintiffs' detriment, including but not limited to the diversion of Plaintiffs' business opportunities to itself and to cause a loss of reputation and good will to Plaintiffs and their suppliers.

58.     On information and belief, Burns Industrial hired Harmon in significant part to

obtain Plaintiffs' Confidential Information from Harmon, which Burns Industrial and Harmon could then leverage in the marketplace.

59.     On February 5, 2021, after Harmon abruptly resigned and before he commenced employment at Burns Industrial, Matthew Adams, President of Towlift, contacted Christopher Burns, the President and owner of Burns Industrial, to advise him of Harmon's conversion of Plaintiff's Confidential Information.

60.     Burns Industrial's response to that information from Matthew Adams was to continue with their plan to employ Harmon the following week.

61.     On information and belief, based on information from the marketplace, Burns Industrial has already utilized Confidential Information provided by Harmon to undercut at least two of the Plaintiffs, Fleet Team and Towlift, in bids to customers.

62.     In one deal in which Fleet Team was managing the bidding for a customer, Burns Industrial bid against itself, *i.e.*, bid less than it previously bid and less than other Hyster/Yale dealerships who had already submitted a bid, presumably with Harmon's knowledge of the bids through his misappropriation of this specific Confidential Information prior to leaving.  The second bid was made directly to the customer, rather than through the proper procedure of providing the bid to Fleet Team.

63.     In another situation, Burns Industrial made a bid below that of Plaintiffs to a customer Harmon had identified on the yellow legal pad listing the fourteen biggest opportunities for Plaintiffs Towlift and Eagle Mark.  Burns Industrial had not previously made a bid on this deal and only bid after Harmon began his employment with Burns Industrial, when it would have had access to Harmon's knowledge concerning the project and Plaintiffs' bid.

64.     Plaintiffs believe that there are many other competitive situations in which Burns Industrial and Harmon are utilizing Plaintiffs' Confidential Information to unfairly compete in the marketplace.

65.     For example, with respect to fleet management, although Burns Industrial had a limited maintenance tracking program through one of its vendors, this program is very different than the Fleet Team model.  Harmon converted Fleet Team's proprietary model and templates, which are much more fully developed than that of Burns Industrial, for his own benefit and that of Burns Industrial.

66.     Through the hire of Harmon as Vice President: Business Development and Fleet, Plaintiffs believe that Burns Industrial intends to now mirror Fleet Team's model and enter this consulting market.

67.     Notably, Burns Industrial is now calling on customers and potential customers of Fleet Team and submitting bids based on the Confidential Information misappropriated by Harmon.

68.     Burns Industrial has used, intends to continue to use, and will be utilizing more of, its Confidential Information acquired from Harmon in a bid to take customers from Plaintiffs and compete unfairly.

69.     It is wrongful and contrary to applicable law to utilize misappropriated trade secrets to gain an advantage in the marketplace at the expense of the company whose trade secrets have been misappropriated.

### Harmon's Duties of Loyalty and Good Faith to Plaintiffs

70.     Plaintiffs take reasonable efforts under the circumstances to maintain their Confidential Information's secrecy including prohibiting employees from printing or copying the Confidential Information, maintaining a policy prohibiting the disclosure or misuse of

14

Confidential Information, and limiting those employees who can access Confidential Information.

71.     As an executive employee and a member of the Executive Committee, Harmon owed Plaintiffs duties of loyalty and good faith.

72.     Harmon failed to act in good faith and for Plaintiffs' sole benefit in the course of his employment.

73.     Plaintiffs suffered injury as a result of Harmon's failure to act solely for Plaintiffs' benefit and in conformity with his required duty of loyalty which was a causal factor in bringing about that injury.

74.     Harmon acquired this Confidential Information, including trade secrets, by improper means.

75.     Harmon's misappropriation of trade secrets was willful and malicious.

### Harmon's Recent Efforts at "Mitigation"

76.     Harmon, following correspondence from Plaintiffs' counsel regarding the misappropriation, retained counsel. His counsel admitted to Harmon's taking and possession of Plaintiffs' Confidential Information on a laptop (which Harmon apparently bought specifically for this purpose) and an external hard drive, and offered to have such information deleted by a third party.

77.     Harmon's recent efforts at "mitigation" do not mitigate the damages, fail to remedy the loss of confidentiality, and cannot erase what he and Burns Industrial have committed to memory, downloaded or copied to other devices or formats, or already used.

### Interstate Commerce is Affected

78.     Plaintiffs have locations in multiple states, including in Pennsylvania and Ohio.

79.     Plaintiffs sell products and services to customers located in multiple states, including but not limited to Ohio, Pennsylvania, West Virginia, and North Carolina.

80.     Plaintiffs' Confidential Information relates to customers located in the above states.

**COUNT I: MISAPPROPRIATION OF TRADE SECRETS**
**IN VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(Against All Defendants)**

81.     Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

82.     The Confidential Information to which Harmon was exposed and had access to as General Manager of Towlift, and as a member of GNCO's Executive Committee, constitutes trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839 *et seq.*

83.     As set forth in paragraphs 78 through 80 above, the products and services involved in this case affect interstate commerce.

84.     Harmon and Burns Industrial have acquired, used, and misappropriated Plaintiffs' trade secrets through improper means for an improper purpose.  These trade secrets are actual secrets of particular importance to Plaintiffs, constitute competitive value to Plaintiffs, have independent economic value, and are critical to Plaintiffs' ability to serve existing and prospective customers and to compete for their business.

85.     Plaintiffs' trade secrets would be uniquely valuable to Plaintiffs' competitors, including Burns Industrial, as they not only compete within the same market but Burns desires to enter  additional markets in which Plaintiffs already competitively operate, and these trade secrets are not ascertainable unless they are taken from Plaintiffs.

86.     On information and belief, it is for this reason that Burns Industrial authorized and ratified Harmon's unlawful conduct.

87.     Harmon was not authorized to take or use these trade secrets outside of his employment with Plaintiffs and, specifically, was not authorized to take or use these trade secrets for the benefit of or in connection with any employment for Burns Industrial.

88.     Burns Industrial is not authorized to accept or use these trade secrets and, Burns Industrial knows that these trade secrets were acquired through improper means including being advised by the President of Towlift that Harmon had improperly taken Plaintiffs' trade secrets prior to the commencement of Harmon's employment. Further, Burns Industrial has inevitably acquired additional trade secrets belonging to Plaintiffs as it continues to employ Harmon.

89.     Plaintiffs take, and took, reasonable steps to maintain confidentiality with respect to their Confidential Information and trade secrets, including prohibiting employees from printing or copying the Confidential Information, maintaining a confidential and proprietary information policy prohibiting the disclosure or misuse of such information, and limiting those employees who can access such information.

90.     Defendants are obligated not to use or disclose trade secret information learned in the course of Harmon's employment with Plaintiffs, and the obligations continue even after the end of Harmon's employment with Burns Industrial.

91.     Harmon made known his intent to use the misappropriated trade secrets in violation of Plaintiffs' confidence by threatening to acquire Plaintiffs' business accounts located in Cleveland, Ohio.

92.     Defendants' misappropriation of trade secrets and use of trade secrets was willful and malicious.

93.     Defendants' misappropriation of trade secrets violates the Defend Trade Secrets Act, 18 U.S.C. § 1836.

94.     As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, attorneys' fees, loss of trade secrets, and exemplary damages.

### COUNT II: MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF PENNSYLVANIA'S UNIFORM TRADE SECRETS ACT
#### (Against All Defendants)

95.     Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

96.     The Confidential Information to which Harmon was exposed and had access to as General Manager of Towlift and as a member of the Executive Committee constitutes trade secrets within the meaning of Pennsylvania's Uniform Trade Secrets Act, 12 Pa.C.S. § 5302.

97.     Harmon and Burns Industrial acquired, used, and misappropriated these trade secrets through improper means and for an improper purpose.

98.     These trade secrets are actual secrets of peculiar importance to Plaintiffs, constitute competitive value to Plaintiffs, have independent economic value, and are critical to Plaintiffs' ability to serve existing and prospective customers and to compete for their business.

99.     These trade secrets would be uniquely valuable to Plaintiffs' competitors, including Burns Industrial, as they service the same customers, and these trade secrets are not ascertainable unless they are taken from Plaintiffs.

100.    Harmon was not authorized to take or use these trade secrets outside of his employment with Plaintiffs and, specifically, was not authorized to take or use these trade secrets in connection with any employment for Burns Industrial.

101.    Plaintiffs take, and took, reasonable steps to maintain confidentiality with respect to their Confidential Information and trade secrets, including prohibiting employees from printing the Confidential Information, maintaining a confidential and proprietary information

policy prohibiting the disclosure or misuse of such information, and limiting those employees who can access such information.

102.    Harmon is obligated not to disclose or use trade secret information learned in the course of his employment with Plaintiffs, and Harmon's obligations continue even after the end of his employment with Plaintiffs.

103.    Burns Industrial is not authorized to accept or use these trade secrets and Burns Industrial has actual knowledge that these trade secrets were acquired through improper means as the President of Burns Industrial was advised by the President of Towlift that Harmon had improperly taken Plaintiffs' trade secrets prior to the commencement of Harmon's employment at Burns Industrial. Further, Burns Industrial has inevitably acquired additional trade secrets of Plaintiffs as it continues to employ Harmon.

104.    Harmon threatened to use Plaintiffs' trade secrets in violation of Plaintiffs' confidence by threatening to acquire Plaintiffs' business accounts located in Cleveland, Ohio for the benefit of Harmon and Burns Industrial.

105.    Defendants' misappropriation of trade secrets was willful and malicious.

106.    Defendants' misappropriation of trade secrets violates Pennsylvania's Uniform Trade Secrets Act, 12 Pa.C.S. § 5301 et seq.

107.    As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, attorneys' fees, loss of trade secrets, and exemplary damages.

### COUNT III: MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF OHIO'S UNIFORM TRADE SECRETS ACT
#### (Against All Defendants)

108.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

109.    The Confidential Information to which Harmon was exposed and had access to as General Manager of Towlift, and as a member of the Executive Staff, constitutes trade secrets within the meaning of Ohio's Uniform Trade Secrets Act, O.R.C. § 1333.61(D).

110.    Harmon and Burns Industrial acquired, used, and misappropriated these trade secrets through improper means and for an improper purpose.

111.    These trade secrets are actual secrets of peculiar importance to Plaintiffs, constitute competitive value to Plaintiffs, have independent economic value, and are critical to Plaintiffs' ability to serve existing and prospective customers and to compete for their business.

112.    These trade secrets would be uniquely valuable to Plaintiffs' competitors, including Burns Industrial, as they service the same customers, and these trade secrets are not ascertainable unless they are taken from Plaintiffs.

113.    Harmon was not authorized to take or use these trade secrets outside of his employment with Plaintiffs and, specifically, was not authorized to take or use these trade secrets in connection with any employment for Burns Industrial.

114.    Plaintiffs take, and took, reasonable steps to maintain confidentiality with respect to their Confidential Information and trade secrets, including prohibiting employees from printing the Confidential Information, maintaining a confidential and proprietary information policy prohibiting the disclosure or misuse of such information, and limiting those employees who can access such information.

115.    Harmon is obligated not to disclose or use trade secret information learned in the course of his employment with Plaintiffs, and Harmon's obligations continue even after the end of his employment with Plaintiffs.

116.     Burns Industrial is not authorized to accept or use these trade secrets and Burns Industrial knows that these trade secrets were acquired through improper means as the President of Burns Industrial was advised by the President of Towlift that Harmon had improperly taken Plaintiffs' trade secrets. Further, Burns Industrial has inevitably acquired some of Plaintiffs' trade secrets as it continues to employ Harmon.

117.     Harmon threatened to use trade secrets in violation of Plaintiffs' confidence by threatening to acquire Plaintiffs' business accounts located in Cleveland, Ohio for the benefit of Harmon and Burns Industrial.

118.     Defendants' misappropriation of trade secrets was willful and malicious.

119.     Defendants' misappropriation of trade secrets violates Ohio's Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq*.

120.     As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, attorneys' fees, loss of trade secrets, and exemplary damages.

### COUNT IV: INEVITABLE DISCLOSURE OF TRADE SECRETS
(Against all Defendants)

121.     Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

122.     The Confidential Information to which Harmon had access to as General Manager of Towlift and as a member of the Executive Staff constitutes trade secrets within the meaning of the Defend Trade Secrets Act, Pennsylvania's Uniform Trade Secrets Act, and Ohio's Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq*.

123.    Harmon learned of these trade secrets in his role as General Manager of Towlift and as a member of the Executive Committee.  Harmon acquired these trade secrets through improper means shortly before abruptly resigning.

124.    Towlift, Eagle Mark, and Fleet Team are in the material handling business and buy, sell, lease, and remarket forklifts, lift trucks, and other light construction or material handling equipment and provide consulting services with respect to this type of equipment.

125.    Burns Industrial, like Plaintiffs, is in the material handling business. Burns Industrial buys, sells, leases, and remarkets forklifts and other light construction or material handling equipment.

126.    Plaintiffs and Burns Industrial are competitors within the material handling business and share very similar product lines.

127.    Harmon's roles and responsibilities at GNCO and its subsidiaries are similar to those he will perform at Burn's Industrial's Vice President:  Business Development and Fleet.

128.    It is inevitable that Harmon will disclose trade secrets, and that Confidential Information and trade secrets unlawfully acquired will filter into his work for Burns Industrial, as Harmon's roles with Towlift, GNCO, and its subsidiaries will be very similar.

129.    Harmon cannot possibly separate the Confidential Information he has either taken, or retains, from Plaintiffs from any work he performs for Burns Industrial.

130.    As shown by his misappropriation of Plaintiffs' Confidential Information, it is inevitable that Harmon plans on using, or retaining, Confidential Information – regardless of any claims he may make to have destroyed that information. Likewise, Burns Industrial's decision to hire Harmon even after it was advised of Harmon's improper taking of Plaintiffs' Confidential

Information demonstrates that it expects Harmon to utilize and/or disclose Plaintiffs' Confidential Information while employed at Burns Industrial.

131.    If Plaintiffs' trade secrets are disclosed, they will suffer irreparable harm in the form of lost profits and business opportunities.

132.    As Harmon's disclosure of trade secrets is inevitable, and as there a substantial threat of continued disclosure, Plaintiffs seek an order enjoining and restraining Harmon from working for, or otherwise being employed by, Burns Industrial Equipment, Inc.

<strong>COUNT V: BREACHES OF THE<br>FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH<br>(Pursuant to Ohio Common Law - Against Harmon)</strong>

133.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

134.    As General Manager for Towlift and as a member of the Executive Committee, Harmon owed Plaintiffs duties of loyalty, good faith, fair dealing, and to act in a manner not opposed to the best interests of the Plaintiffs' corporations.

135.    For several weeks, if not several months, before his resignation, Harmon acted for the benefit of entities other than Plaintiffs.

136.    Harmon intentionally breached his duties of good faith and loyalty, and acted for the benefit of other entities, when he accessed Plaintiffs' Confidential Information, while still employed by Towlift, with the intent of misappropriating that Confidential Information.

137.    Harmon breached his duties of good faith and loyalty to Plaintiffs when, while still employed by Towlift, he improperly accessed Plaintiffs' Confidential Information and transcribed it onto a piece of paper with the intent of using the information for his own benefit once he left the employ of Towlift.

138.     Harmon breached his duties of good faith and loyalty to Plaintiffs when, while still employed by Towlift, he improperly accessed Plaintiffs' Confidential Information and saved it to an external drive with the intent of using the information for his own benefit (and the benefit of Burns Industrial) once he left the employ of Towlift.

139.     Harmon's conduct also violates several of the provisions of Towlift's Employee Handbook, further demonstrating breaches of the duty of good faith and loyalty as well as the duty of care.

140.     Plaintiffs have suffered injury in lost profit, attorneys' fees, and lost trade secrets.

141.     Harmon's failure to act in good faith and solely for the Plaintiffs' benefit caused Plaintiffs' injuries including the loss of profit, loss of good will, attorneys' fees, and lost trade secrets.

142.     As a direct and proximate result of Harmon breaching his duties of good faith and loyalty, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, lost good will, attorneys' fees, and loss of trade secrets.

## COUNT VI: BREACHES OF THE
## FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH
### (Pursuant to Pennsylvania Common Law - Against Harmon)

143.     Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

144.     As General Manager for Towlift and as a member of the Executive Committee, Harmon owed Plaintiffs duties of loyalty, good faith, fair dealing, and to act in a manner not opposed to the best interests of the Plaintiffs' corporations.

145.     For several weeks, if not several months, before his resignation, Harmon acted for the benefit of entities other than Plaintiffs.

146.     Harmon intentionally breached his duties of good faith and loyalty, and acted for the benefit of other entities, when he accessed Plaintiffs' Confidential Information, while still employed by Towlift, with the intent of misappropriating that Confidential Information.

147.     Harmon breached his duties of good faith and loyalty to Plaintiffs when, while still employed by Towlift, he improperly accessed Plaintiffs' Confidential Information and transcribed it onto a piece of paper with the intent of using the information for his own benefit once he left the employ of Towlift.

148.     Harmon breached his duties of good faith and loyalty to Plaintiffs when, while still employed by Towlift, he improperly accessed Plaintiffs' Confidential Information and saved it to an external drive with the intent of using the information for his own benefit once he left the employ of Towlift.

149.     Harmon's conduct also violates several of the provisions of Towlift's Employee Handbook, further demonstrating breaches of the duty of good faith and loyalty as well as the duty of care.

150.     Plaintiffs have suffered injury in lost profit, attorneys' fees, and lost trade secrets.

151.     Harmon's failure to act in good faith and solely for the Plaintiffs' benefit caused Plaintiffs' injuries including the loss of profit, loss of good will, attorneys' fees, and lost trade secrets.

152.     As a direct and proximate result of Harmon breaching his duties of good faith and loyalty, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, lost good will, attorneys' fees, and loss of trade secrets.

## COUNT VII:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendant Burns Industrial)

153.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

154.    As set forth in Count V above, and in the preceding paragraphs of this Complaint, Harmon breached his fiduciary duties of good faith and loyalty to Plaintiffs by misappropriating Plaintiffs' Confidential Information for his own use and for the use of Burns Industrial.

155.    At all times, Burns Industrial was aware that it was a breach of Harmon's fiduciary duties to Plaintiffs to misappropriate Plaintiffs' Confidential Information.

156.    On information and belief, Burns Industrial provided substantial inducement, direction, assistance and encouragement to Harmon in effecting his breach of fiduciary duties.

157.    At all times, Burns Industrial acted willfully, wantonly, and maliciously, and their outrageous conduct entitles Plaintiffs to an award of punitive damages in an amount to be determined at trial.

158.    Plaintiffs have been substantially harmed by Harmon's egregious breach of fiduciary duties and Burns Industrial's inducement, assistance and encouragement thereof, in a monetary amount to be proven at trial, including lost profits, lost good will, attorneys' fees, and loss of trade secrets.

159.    Burns Industrial has or will be unjustly enriched by its wrongful activities in the form of revenues, profits, commissions, and other payments received from Plaintiffs' customers, distributors, suppliers and other third parties.

## COUNT VIII:  COMMON LAW CONVERSION
### (Against All Defendants)

160.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

161.    Defendants have deprived the Plaintiffs of the Plaintiffs' property in the form of their Confidential Information.

162.    Defendants did not have the Plaintiffs' consent to deprive the Plaintiffs of their property in the form of their Confidential Information.

163.    Harmon intended to exercise dominion or control over Plaintiffs' property as shown by accessing the Confidential Information, transcribing it, and downloading it onto a USB drive or other external drive.

164.    Burns Industrial intended to exercise dominion or control over Plaintiffs' property as shown by continuing to employ Harmon after being warned that Harmon had taken Plaintiffs' Confidential Information.

165.    As a direct and proximate result of Defendants' conversion, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, lost good will, attorneys' fees, and loss of trade secrets.

## COUNT IX: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (Against All Defendants)

166.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

167.    Plaintiffs have existing and prospective contractual relationships with their customers.

168.    Defendants took purposeful action, specifically intending to harm the existing contractual relations of Plaintiffs, or to prevent prospective contractual relations from occurring between Plaintiffs and their customers.

169.    Illustratively, Harmon took purposeful action in misappropriating Plaintiffs' trade secrets with the intent to harm their relationships with existing and prospective customers in Cleveland, Ohio as shown by his comments to his co-worker or former co-worker.

170.    Specifically, Burns Industrial took purposeful action when it continued to employ Harmon after learning that Harmon had improperly taken Plaintiffs' Confidential Information.

171.    Defendants were not privileged in misappropriating Plaintiffs' trade secrets and were not privileged when they intended to harm Plaintiffs' existing or prospective contractual relations.

172.    As a direct and proximate result of Defendants' tortious interference with business relationships, Plaintiffs have been damaged in a monetary amount to be proven at trial, including lost profits, lost good will, and attorneys' fees.

### COUNT X:  UNFAIR COMPETITION/UNJUST ENRICHMENT
**(Against All Defendants)**

173.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

174.    Defendants misappropriated Plaintiffs' Confidential Information by improper means and for the purpose of unfairly competing against Plaintiffs, including stealing Plaintiffs' Confidential Information and customers.

175.    Defendants' misappropriation and use of Plaintiffs' Confidential Information has and will continue to cause significant harm to Plaintiffs, including loss of profits, lost good will, attorneys' fees, and costs.

176.    Defendants are liable to Plaintiffs for such damages and harm.

177.    At all times, Defendants acted willfully, wantonly and maliciously, and their outrageous conduct entitles Plaintiffs to an award of punitive damages in an amount to be

determined at trial.

## COUNT XI:  ACCOUNTING
### (Against All Defendants)

178.    Plaintiffs incorporate herein by reference all allegations set forth in the above paragraphs as if fully rewritten herein.

179.    As set forth above, Defendants engaged in, or aided and abetted in, misappropriation of trade secrets, breaches of fiduciary duties, tortious interference with business relationships, unfair competition, and conversion.

180.    Plaintiffs do not have an adequate remedy at law for the harm caused to the Plaintiffs by Defendants' misconduct.

181.    Plaintiffs are entitled to an accounting by all Defendants of all customers, sales, revenues, payments, commissions, and profits diverted from Plaintiffs' businesses and/or obtained by Defendants as a result of their misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs GNCO, Towlift, Eagle Mark, and Fleet Team respectfully request that this Court grant judgment in their favor and against Defendants Ryan Harmon and Burns Industrial as follows:

(a)    Enjoin and restrain Harmon from working for, or otherwise being employed by, Burns Industrial or a like competitor;

(b)    Enjoin and restrain Defendants and any other person or entity acting in aid or concert, or in participation with them, or at their direction, from using or disclosing any of Plaintiffs' trade secrets or confidential or proprietary information;

(c)    Order Defendants to provide an accounting of all of Plaintiffs' trade secrets and confidential or proprietary information in possession of Defendants, and an accounting of all

profits, monies, or other compensation received through the use of Plaintiffs' trade secrets and confidential and proprietary information;

(d)     Award Plaintiffs compensatory damages in an amount to be proven at trial;

(e)     Award Plaintiffs their costs and attorneys' fees;

(f)     Award Plaintiffs exemplary damages in an amount not exceeding twice any award made as Harmon's misappropriation of trade secrets was willful and malicious pursuant to the Defend Trade Secrets Act and Pennsylvania's Trade Secrets Act;

(g)     Award Plaintiffs exemplary damages in an amount not exceeding three times any award made as Harmon's misappropriation of trade secrets was willful and malicious pursuant to the Ohio Uniform Trade Secrets Act;

(h)     Award Plaintiffs punitive damages and costs in an amount to be determined at trial;

(i)     Award Plaintiffs the compensation they paid to Harmon while he was employed by Plaintiffs and breaching his duties of good faith and loyalty;

(j)     Require Harmon and Burns to immediately return, delete, or erase all Plaintiffs' trade secrets, and confidential and proprietary information in their possession; and

(k)     Award such other relief as this Court deems just and equitable.


Dated:     March 8, 2021                         Respectfully submitted,

                                                 */s/ Elly Heller-Toig*
                                                 Elly Heller-Toig, PA I.D. #33244
                                                 Moira Cain-Mannix, PA I.D. #81131
                                                 Matthew R. Mazgaj, PA I.D. #327068

                                                 MARCUS & SHAPIRA LLP
                                                 301 Grant Street
                                                 One Oxford Centre, 35th Floor
                                                 Pittsburgh, PA 15219-6401
                                                 Telephone: 412-471-3490

Facsimile: 412-391-2315
E-mail: ehtoig@marcus-shapira.com
E-mail: cain-mannix@marcus-shapira.com
E-mail: mazgaj@marcus-shapira.com

   -and-

*/s/ Carl H. Gluek*
Carl H. Gluek
FRANTZ WARD LLP
200 Public Square, Suite 3000
Cleveland, OH 44114-1230
Telephone: 216-515-1660
Facsimile: 216-515-1650
E-mail: cgluek@frantzward.com

(*Pro Hac Vice* motion to be filed)

*Attorneys for Plaintiffs*

## **VERIFICATION**

Matthew Adams, being duly sworn, deposes and says that he serves as President of each of the four Plaintiffs, GNCO Inc. ("GNCO"), Towlift, Inc. ("Towlift"), Eagle Mark 4 Equipment Co. ("Eagle Mark"), and Fleet Team, Inc. ("Fleet Team") (collectively, "Plaintiffs") named in the Complaint; and that he has read the foregoing Complaint and knows the contents thereof and that the same are true of this own knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters he believes them to be true.

March 4, 2021

_____

Matthew Adams, President